UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KAREN PASICZNYK,

                      Plaintiff,      **No. 6:16-cv-06745(MAT)**
                                      **DECISION AND ORDER**

             -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                      Defendant.

---

## INTRODUCTION

Represented by counsel, Karen Pasicznyk ("Plaintiff") instituted this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Acting Commissioner of Social Security ("the Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB"). The Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## PROCEDURAL STATUS

On April 25, 2013, Plaintiff filed an application for DIB, alleging an onset date of May 2, 2001. (T.333-37), and a date last insured of December 31, 2005 (T.355).[2] Plaintiff alleged disability

---

[1]

Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted, therefore, for Acting Commissioner Carolyn W. Colvin as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]

Citations to "T." in parentheses refer to pages from the transcript of the certified administrative record.

based upon, <u>inter</u> <u>alia</u>, a work-related right knee injury, with degenerative changes and osteoarthritis; left knee degenerative joint disease, status post-left knee arthroscopy and medial meniscectomy in June 2004, and osteoarthritis; chronic back pain, status post-L5-S1 discectomy on July 23, 2012 due to disc herniation, and continued disc space narrowing in April 2013; and asthma. (T.367-76, 410-13). Plaintiff's application was denied initially on August 5, 2013, and she timely requested a hearing on August 9, 2013. (T.259-84). Administrative law judge Connor O'Brien ("the ALJ") conducted a hearing on March 11, 2015, in Rochester, New York. Plaintiff appeared with her attorney and testified, as did an impartial vocational expert ("the VE"). (T.191-249). On July 14, 2015, the ALJ issued an unfavorable decision. (T.174-90). The Appeals Council denied Plaintiff's request for review on September 15, 2016, making the ALJ's decision the final decision of the Commissioner. Plaintiff then timely commenced this action.

Plaintiff and Defendant have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The Court will discuss the record evidence further below, as necessary to the resolution of the parties' contentions.

For the reasons discussed below, the Commissioner's decision is affirmed.

## THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation established by the Commissioner for adjudicating disability claims. See 20 C.F.R. §§ 404.1520, 416.920.

The ALJ first found that Plaintiff last met the insured status requirements of the Act on December 31, 2005, and did not engage in substantial gainful activity during the period from her alleged onset date of May 2, 2001, through her date last insured or thereafter.

The ALJ next found that through the date last insured, Plaintiff had the following "severe" impairments: degenerative disc disease of the lumbar spine; asthma; high cholesterol; and bilateral degenerative joint disease of the knees.

At step three, the ALJ determined that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ gave particular consideration to Listings 1.02, 1.04, and 3.03, in connection with Plaintiff's bilateral knee degenerative joint disease, lumbar degenerative disc disease, and asthma, respectively.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she could occasionally lift and/or carry

up to 10 pounds, frequently lift and/or carry less than 10 pounds; could climb a rope, ladder or scaffold; required a sit stand option that allows her to change position every 50 minutes, for up to 5 minutes in duration without leaving the workstation; could occasionally crouch, balance on narrow, slippery or moving surfaces, and climb stairs; could not bend from the waist to the floor, and could not kneel or crawl; when standing, she could not work below waist; and she could tolerate up to occasional exposure to extreme cold, extreme heat, wetness, humidity and air borne irritants.

At step four, the ALJ determined that Plaintiff had past relevant work as a data entry clerk (Dictionary of Occupational Titles ("DOT") #203.582-054) sedentary, semi-skilled, SVP 4); data examination clerk (DOT #209.387-022), sedentary, semi-skilled, SVP 3); and office clerk (DOT #209.562-010) light, semi-skilled, SVP 3). In comparing Plaintiff's RFC with the physical and mental demands, the ALJ determined that she was able to perform the position of a data entry clerk, as actually and generally performed, through the date last insured.

The ALJ made an alternative step-finding that, considering Plaintiff's age (a younger individual age 18-44), education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she could have performed through the date last insured. Specifically, the ALJ

relied on the VE's testimony to conclude that Plaintiff would have been able to perform the requirements of representative occupations such as order clerk (DOT #209.567-014), sedentary, unskilled (SVP 2)), with approximately 19,574 jobs nationally); and table worker (DOT #739.687-182), sedentary, unskilled (SVP 2)), with approximately 13,738 jobs nationally. Accordingly, the ALJ found that Plaintiff was not under a disability as defined in the Act from the onset date through the date last insured.

## SCOPE OF REVIEW

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, the district court is limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law."

<u>Byam v. Barnhart</u>, 336 F.3d 172, 179 (2d Cir. 2003) (citing <u>Townley</u>

<u>v. Heckler</u>, 748 F.2d 109, 112 (2d Cir. 1984)).

**DISCUSSION**

**I.   Failure to Develop the Record by Obtaining a Treating Source Opinion**

Plaintiff contends that the RFC is not based on substantial

evidence because the ALJ's "arbitrary findings are unexplained" and

unsupported by a medical expert opinion. (Pl's Mem. at 19-21). In

the decision, the ALJ noted that "[a]s for opinion evidence that

existed during the period at issue, or directly relates to the

claimant's functioning at that time, there is none." (T.183).

Plaintiff contends that by taking into account the lack of medical

opinion evidence relating to the period at issue, the ALJ

specifically pointed out a gap in the record yet failed to make any

effort to request medical expert opinion evidence to fill the gap.

Defendant counters that the alleged "gap" in the record is illusory

because the record contains her complete medical history, and

Plaintiff's counsel represented at the hearing that the record

contained all of the evidence relevant to her claim. (T.195).

"Because a hearing on disability benefits is a non-adversarial

proceeding, the ALJ generally has an affirmative obligation to

develop the administrative record." <u>Perez v. Chater</u>, 77 F.3d 41, 47

(2d Cir. 1996) (citing <u>Echevarria v. Secretary of Health & Human</u>

<u>Servs.</u>, 685 F.2d 751, 755 (2d Cir. 1982)). "Whether dealing with a

<u>pro</u> <u>se</u> claimant or one represented by counsel, the ALJ must

'develop [the claimant's] complete medical history.'" Lopez v. Comm'r of Soc. Sec., 622 F. App'x 59, 60 (2d Cir. 2015) (summary order) (citing 20 C.F.R. § 404.1512; Perez, 77 F.3d at 47 (describing duty to develop record)). "[T]he agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order) (quoting Rosa v. Callahan, 168 F.3d 72, 79 & n. 5 (2d Cir. 1999)). That is not this case, however. Plaintiff does not contend that the ALJ lacked her complete medical history.

Moreover, the Commissioner's regulations provided that where, as here, a claimant has legal representation, the attorney is "obligat[ed] to assist the claimant in bringing to [the Commissioner's] attention everything that shows that the claimant is disabled[.]" 20 C.F.R. § 404.1740(b)(1) (eff. until Apr. 20, 2015); see also Turby v. Barnhart, 54 F. App'x 118, 122–23 (3d Cir. 2002) (unpublished opn.). In keeping with this principle, "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record—indeed, to exhort the ALJ that the case is ready for decision—and later fault the ALJ for not performing a more exhaustive investigation." Maes v. Astrue, 522 F.3d 1093, 1097 (10th Cir. 2008) (citation omitted).

Here, upon questioning by the ALJ, Plaintiff's attorney confirmed that the record contained "all of the medical evidence, both favorable and unfavorable, relevant to the claim." (T.195). Plaintiff's attorney explained that he had tried to get an "opinion from [Plaintiff's] current primary, through her [sic] Dr. Kowalski, who is from the same practice as Dr. Di Angelo [sic], but Di Angelo[3] . . . is no longer practicing," and therefore he "couldn't get a retrospective opinion there." (T.196). Plaintiff's attorney also indicated that he contacted her orthopedist, Dr. Timothy Clader, who had treated her for several years prior to the date last insured, but "he didn't send [them] back any opinions[.]" (Id.). It is unclear to the Court what specifically Plaintiffs believes that the ALJ should have done at this point with regard to obtaining opinions from Drs. D'Angelo and Clader. Nor does Plaintiff indicate other development of the record should have been conducted or what helpful evidence such development would have produced.

Drs. D'Angelo's and Clader's treatment notes covering the relevant period contradict Plaintiff's claim of total disability and are not inconsistent with the ALJ's RFC assessment. Plaintiff complained to Dr. D'Angelo of back pain and left knee pain in

_____

[3]
   Prior to May 2, 2001, the alleged onset date and the date on which she stopped working as a waitress, and through December 21, 2005, the date last insured, Plaintiff was treated by primary care physician Dr. Carmen A. D'Angelo. (T.615-93).

visits dating back to 1989, well before the alleged onset date of May 2, 2001. (T.675-93). In March 1998, Dr. D'Angelo noted that Plaintiff had a long history of chronic back pain. (T.675). In August 2000, approximately 9 months before she stopped working, Dr. D'Angelo diagnosed Plaintiff with lumbar strain and advised not to perform heavy lifting or straining but was not taken out of work. (T.669).

On May 14, 2001, about two weeks after her onset date, Plaintiff presented to Dr. Clader at Rochester Community Orthopaedics, explaining that on April 16th, she "noticed the onset of right knee" pain while working as a waitress in a restaurant. (T.926). She had no specific injury, and attributed it to "multiple episodes of twisting and turning that she does during the normal course of her day at work." (Id.). Plaintiff told Dr. Clader that she had no history of knee problems. On examination, Dr. Clader observed Plaintiff had moderate tenderness and one equivocally positive sign, but otherwise normal findings including normal stability. X-rays during the visit were normal. Dr. Clader recommended a magnetic resonance imaging (MRI) study to evaluate for medial meniscus tear versus synovitis. Dr. Clader noted that Plaintiff "quit her job as a waitress *partially* because of her concerns of its effect on her overall mobility and health but partially because she felt that she had 'done it enough.'" (T.926) (emphasis supplied). Reviewing the MRI

results on June 7, 2001 (T.927, 932-33), Dr. Clader found that Plaintiff had some underlying degenerative disease, but no evidence of meniscal pathology; he recommended "conservative modalities" including a progressive resistive exercise program, external compression, and "use of oral nonsteroidals." (T.927).

On June 20, 2001, Plaintiff reported ongoing symptoms to Dr. Clader; on examination, she was "unchanged from previously." (T.927). Dr. Clader diagnosed "a fairly marked synovitic flare" for which he administered an injection and advised Plaintiff to return as needed.

On July 19, 2001, Dr. D'Angelo noted that Plaintiff's pain was going to be managed on medication without physical therapy. (T.665). Plaintiff reported that she felt "good at this point in time, she just wanted to make sure she was doing the correct things before going to California this week on vacation." (Id.).

Plaintiff did not return to Dr. Clader until January 31, 2002. (T.927). She reported having been "completely asymptomatic" until a few weeks previously. On examination, Plaintiff had moderate inflammatory symptoms and a small effusion around the knee, indicating a flare. Plaintiff agreed to try glucosamine and chondroitin, and follow up as need.

On May 1, 2002, Plaintiff saw Dr. D'Angelo due to right knee pain. (T.664). Dr. D'Angelo recommended a right knee brace, aquatic and exercise therapy, Bextra anti-inflammatory medication, and a

-10-

glucosamine-chondroitin supplement. On May 2, 2002, Dr. D'Angelo completed a Workers' Compensation form stating that Plaintiff had a right knee strain but was not disabled from regular duties or work. (T.808). Dr. D'Angelo indicated that Plaintiff could work and did not specify any work limitations. (Id.). At a visit with Dr. D'Angelo on June 11, 2002, Plaintiff reported that her knee was improving with physical therapy. Dr. D'Angelo completed another Workers' Compensation form stating that Plaintiff was not disabled from regular duties. (T.804).

Plaintiff returned to Dr. Clader on August 29, 2002, about 8 months following her last appointment with him. (T.928). Dr. Clader noted that Plaintiff had done fairly well with respect to her right knee. Dr. Clader commented that Plaintiff had a very benign exam and that her overall clinical presentation and objective findings were minimal. Dr. Clader observed that it was difficulty to rate Plaintiff's Workers' Compensation schedule loss because she had no measurable atrophy or range of motion deficits. (T.928). Nonetheless, he concluded that it seemed reasonable to assess a 2.5 percent schedule loss of use. (Id.).

On September 17, 2002, Dr. D'Angelo noted that Plaintiff's Worker's Compensation case based on her right knee synovitis was closed, except for ongoing medication. (T.780). On October 31 and November 12, 2002, Plaintiff saw Dr. D'Angelo for synovitis flares; she was an injection on October 31, but refused one on November 12.

(T.662). The physician's assistant stressed the importance of light activity and stretching. (Id.). Plaintiff continued to have periodic synovitis flares. (T.658-61). However, through November 2003, Dr. D'Angelo continued to complete forms stating that Plaintiff was not disabled from regular work duties due to her right knee synovitis. (T.776-77, 785-90, 792).

On May 21, 2004, Dr. D'Angelo completed another Worker's Compensation form again stating that Plaintiff was not disabled from regular duties or work. (T.770).

Through May 25, 2005, Dr. D'Angelo completed additional Worker's Compensation forms, stating that Plaintiff was not disabled from regular duties. (T.760, 763-64). There are no further Worker's Compensation forms from D'Angelo in the record. Through her December 31, 2005 date last insured, Plaintiff continued visits at Dr. D'Angelo's office for synovitis exacerbations and miscellaneous conditions such as an upper respiratory infection and asthmatic bronchitis. (T.655-57, 667, 757-58). Plaintiff's knee pain was managed with Mobic (meloxicam), a non-steroidal anti-inflammatory.

Plaintiff's argument depends on an assumption that her treating physicians, Dr. Clader and Dr. D'Angelo, would have provided a more restrictive RFC assessment than that formulated by the ALJ. Given both doctors' clinical findings and treatment notes, and Dr. D'Angelo's Worker's Compensation reports, this was highly

unlikely. Had Dr. Clader or Dr. D'Angelo provided a highly restrictive RFC assessment, it would have been inconsistent with their relatively benign clinical findings and assessments, and the ALJ certainly would have considered this inconsistency in assigning weight to their opinions. Because it is "'doubtful that a medical source statement from any of these providers would have altered the ALJ's assessment of Plaintiff's RFC[,]'" "'[r]emand is not required based on the ALJ's failure to request a medical source statement from one of Plaintiff's treating physicians.'" Castle v. Colvin, No. 1:15-CV-00113(MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (quoting Hogan v. Colvin, No. 12-CV-1093, 2015 WL 667906, at *6 (W.D.N.Y. Feb. 17, 2015)); see also Reices-Colon v. Astrue, 523 F. App'x 796, 799 (2d Cir. 2013) ("Reices-Colon's record supplementation argument is similarly baseless. She identifies no specific record that was missing, much less explains how it would have affected her case.").

## II.  RFC Unsupported by Substantial Evidence

It is beyond debate that "[a] 'period of disability' can only commence . . . while an applicant is 'fully insured.'" Arnone v. Bowen, 882 F.2d 34, 38 (2d Cir. 1989) (quoting Sprow v. Bowen, 865 F.2d 207, 209 (9th Cir. 1989); 42 U.S.C. § 416(i)(2)(C)). Regardless of the seriousness of Plaintiff's alleged present disability, unless she became disabled before December 31, 2005, the date last insured, she cannot be awarded benefits under the

Act. See id. ("Arnone cannot obtain disability insurance benefits unless he is eligible for a 'period of disability.' He cannot be entitled to a 'period of disability' unless his back problem rendered him disabled beginning no later than March 1977 and continuing at least until January 1980.") (collecting cases). Here, Plaintiff has not sustained her burden of proving that she was under a disability as defined in the Act prior to December 31, 2005.

In support of her substantial evidence argument, Plaintiff relies on Worker's Compensation forms completed by Dr. D'Angelo beginning on October 21, 2006, indicating that Plaintiff was disabled from regular duties and could not do any type of work. (T.702-08, 755). However, the significant shift in Dr. D'Angelo's opinion regarding Plaintiff's functional limitations is directly attributable to Plaintiff's unfortunate re-injury of her knee in September 2006, at her home. Thus, comprehensive view of the record shows that the Worker's Compensation forms by Dr. D'Angelo that post-date December 31, 2005, are not retrospective in nature. And, as discussed in the foregoing section, the Worker's Compensation forms completed by Dr. D'Angelo during the relevant period, prior to December 31, 20905, directly contradict Plaintiff's claim of totally disabling limitations. Thus, these later forms submitted by Dr. D'Angelo do not support Plaintiff's substantial evidence argument.

Contrary to Plaintiff's contention, the opinion of independent medical examiner Dr. Richard J. DellaPorta  is not inconsistent with the ALJ's RFC assessment. As Defendant points out, even as late as October 25, 2007, Dr. Della Porta opined that Plaintiff's "right knee would preclude her from doing work which required standing/walking for more than 2 hours at one time and there should be no repetitive kneeling, squatting or climbing. (T.483). This specific function-by-function evaluation by Dr. DellaPorta supports the ALJ's RFC assessment that Plaintiff could perform a range of sedentary work prior to the date last insured, with several additional limitations, including restrictions (no kneeling or climbing, and only occasional squatting) that are the same as, or consistent with, those assigned by Dr. DellaPorta. An RFC assessment is not required to "perfectly correspond with any of the opinions of medical sources cited in his decision[;]" rather, the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (unpublished opn.)

III. **Erroneous Credibility Analysis**

Plaintiff claims that the credibility assessment was flawed because "[t]he ALJ . . . failed to follow the two-step process for evaluating [her] allegations." (Pl's Mem. at 27). As Plaintiff notes, the ALJ employs a two-step process in considering the severity of the claimant's subjective symptomatology by first

asking whether the claimant has a medically determinable impairment that could reasonably be expected to cause her alleged symptoms, and if so, the extent to which those symptoms credibly limit the claimant's ability to function in a work setting. <u>See</u> 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).

Here, the ALJ specifically referenced this two-step process and the applicable regulations, and ultimately concluded Plaintiff's allegations on the disabling severity of her symptoms were not supported by the evidence in the record as a whole. (T.181). Plaintiff contends that the ALJ "failed to indicate how Plaintiff's contentions are not substantiated by the objective medical evidence" and asserts "[i]t is unclear from the ALJ's brief summary of the treatment evidence as to how Plaintiff's allegations are inconsistent with the objective evidence." (Pl's Mem. at 27-28). Plaintiff then refers to diagnostic imaging results that pre- and post-date the date last insured and argues that "the diagnostic imaging evidence supports Plaintiff's allegations of limitations relating to her bilateral knee impairments prior to the date last insured and continuing forward despite surgical intervention." (<u>Id.</u> at 28). This argument is unfounded because it relies heavily on evidence that not only post-dates Plaintiff's date last insured, but also post-dates her re-injury of her right knee in September 2006, and subsequent worsening of her condition. Indeed, the 2001 MRI and 2002 x-rays, cited by Plaintiff, did not reveal severe

findings. The impression from the 2001 MRI was "*minimal* cartilaginous degeneration of the medial patellofemoral compartments," "*minimal* mucoid degeneration of the posterior horn of the medial meniscus" with "*no evidence* of a meniscal tear," a "*small* joint effusion," and a "*small* popliteal cyst." (T.736-37 (emphases supplied). The 2002 x-ray cited by Plaintiff was taken of the left, not the right knee. (T.900). Moreover, it showed only "*minimal* medial joint compartment narrowing" and an "*otherwise normal* knee." (T.900 (emphases supplied). There was "*no evidence* of joint effusion or degenerative change." (Id. (emphasis supplied).

Even if the objective imaging results from the relevant period showed severe degenerative changes or injuries, which they do not, a diagnosis without a finding as to the severity of functional limitations as a result of that diagnosis does not compel a finding of disability. See Prince v. Astrue, 514 F. App'x 18, 20 (2d Cir. 2013) (unpublished opn.) (citations omitted). The evidence of record, including the treatment notes discussed in the foregoing section, as well as Plaintiff's own statements about her limitations during the relevant time period, do not support a finding of disability. In physical therapy in 2002 and 2004, as the ALJ noted, Plaintiff admitted that she could climb stairs, and generally reported that the only time she had any pain was with deep squatting. (T.182 (citing T.506, 508-09, 512, 659, 664)). At the hearing, Plaintiff testified to her limitations during the

relevant time period, and her testimony is not inconsistent with the ALJ's RFC assessment. For instance, Plaintiff testified that she had trouble bending at the waist and reaching forward due to back pain, and this caused her back to go out "probably . . . maybe four times" between 2001 to 2005. (T.210-13). When that happened she needed to use a walker or crutches. (Id.). She was able to drive he children to school every day, she did housekeeping which included cleaning, light vacuuming, and laundry. She was able to carry a full laundry basket up the stairs, but had to place the basket on the stairs a few steps ahead of her due to her balance issues. (T.217-18). When grocery shopping, she would use the cart for more balance and would sometimes sit down to rest on the patio furniture on display at Wegman's. (T.218). She was able to cook meals and do a little baking. (T.220-21). The most she could lift at once was about 15 pounds, but it would be about 5 pounds if she had to do it three times a day. (T.221-22). Even after the date last insured, on October 25, 2007, Dr. DellaPorta wrote that Plaintiff did "housework including cooking, dishes, vacuuming, laundry, driving, [and] shopping" and did "yard work including weeding and trimming the bushes." (T.483). At that time, she told Dr. Della Porta that she had "intermittent discomfort in her right knee precipitated by going down the stairs," and her ability to stand/walk was "limited to a little more than 2 hours." (Id.).

While it is undisputed that Plaintiff's knee condition worsened significantly by the time of the administrative hearing, that was nearly a decade *after* her date last insured. The relevant issue is whether Plaintiff's condition during the relevant period was so severely disabling as to preclude any substantial gainful employment. Plaintiff's contemporaneous statements to her treatment providers as well as her hearing testimony regarding her limitations during the relevant period are inconsistent with a conclusion that she was unable to perform a limited range of sedentary work, as determined by the ALJ.

## CONCLUSION

For the foregoing reasons, the Court finds that the Commissioner's decision is not legally erroneous and is supported by substantial evidence. Accordingly, the Commissioner's decision is affirmed. Defendant's motion for judgment on the pleadings is granted, and Plaintiff's motion for judgment on the pleadings is denied. The Clerk of Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____
HON. MICHAEL A. TELESCA
United States District Judge

Dated:    September 28, 2017
          Rochester, New York.